1
2
3
4
5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

6
7
8
9
10
11

THOMAS W.S. RICHEY,

                              Plaintiff,

       v.

D. DAHNE,

                              Defendants.

Case No. 3:12-cv-05060-BHS-KLS

REPORT AND RECOMMENDATION

Noted for July 15, 2016

12
13
14
15
16
17

        This matter is before the Court on plaintiff's motion for partial summary judgment and

defendant's cross motion for summary judgment. Plaintiff has sued defendant for violating his

First Amendment right to redress grievances and to be free of retaliation.[1] This matter has been

referred to the undersigned Magistrate Judge.[2] For the reasons set forth below, the undersigned

recommends the Court deny plaintiff's motion and grant defendant's cross motion.

<u>FACTUAL AND PROCEDURAL HISTORY</u>

18
19
20
21
22
23
24

        The Washington State Department of Corrections (DOC) has an Offender Grievance

Program (OGP) that has been in effect since the early 1980s.[3] "Under the OGP, inmates may file

grievances on a wide range of issues relating to their incarceration," including "the actions of

staff" and "retaliation by staff for filing grievances."[4] Inmates are directed to write "a simple,

straight-forward statement of concern" within the space provided for that purpose on a formal

25
26

[1] Dkt. 4, p. 5.

[2] *Mathews, Secretary of H.E.W. v. Weber*, 423 U.S. 261 (1976); 28 U.S.C. § 636(b)(1)(B); Local Rule MJR 4(a)(4).
[3] Dkt. 52-1, p. 2.
[4] *Id.* at p. 3.

REPORT AND RECOMMENDATION - 1

grievance form when writing a grievance.[5] When an inmate has "not written a simple, straight-forward statement of concern" or the inmate's "complaint contains profane language, except when used as a direct quote," the grievance form is returned "unprocessed with a notation to rewrite it."[6]

According to the DOC, the OGP is "critical to the safety and security of DOC prisons."[7] This is "because it promotes respectful, peaceful, and efficient resolution of conflicts within the prisons," and is "possible because it promotes proper and effective communication between staff and offenders in an effort to resolve issues at the lowest possible level."[8] Because "[t]he use of derogatory and abusive language towards staff in a written grievance establishes a hostile and combative" environment, "undermines the conciliatory goals of the" OGP, and "detracts from the integrity of the grievance system," DOC grievance coordinators "sometimes give rewrite instructions asking for the removal of [such] language that has no bearing on the offender's complaint."[9] When this happens, the inmate "is directed to rewrite the grievance without the derogatory or abusive language where possible, based on what a reasonable person would know and understand to be derogatory or abusive."[10]

"Outside the four corners of a written grievance, the [DOC] has the authority to infract and disciplines [sic] offenders who use abusive language, harassment, or other offensive behavior directed against staff."[11] If an inmate "does not follow the rewrite instruction within the

---

[5] Dkt. 52-2, p. 30.

[6] *Id.* at p. 33.

[7] Dkt. 52-1, p. 4.

[8] *Id.* at pp. 4-5.

[9] *Id.* at pp. 5-6.

[10] *Id.* at p. 7.

[11] *Id.* at p. 6.

REPORT AND RECOMMENDATION - 2

required timeframe" – within five days of receipt of those instructions – "the matter is considered administratively withdrawn, which is the procedural determination made when OGP deadlines are missed without reason for the delay."[12] An inmate, however, "can submit another grievance on the issue even if [a grievance] has been administratively withdrawn."[13]

At all times relevant to this matter, plaintiff was an inmate at the DOC's Stafford Creek Corrections Center (SCCC).[14] On November 11, 2011, plaintiff submitted a written grievance in which he asserted that:

> On 11-10-11, an extremely obese Hispanic female guard on [the Intensive Management Unit (IMU)]'s 2nd shift verbally corrected me from turning after stepping back from my cell. On the way along the tier, she tugged and shook my arm and asked me if I heard her. I said, "I'm not deaf. I heard you." On the way down the steps, she told me not to pull her (I wasn't). I rolled my eyes and said, "Here we go." I have previously been subject to abusive treatment from this unprofessional obese guard. She has taken my right to a shower on previous occasions because I commented about her need to diet. After I said, "Here we go," she pulled on my arm painfully and told me to go back to my cell. She denied me of my right to yard and to a shower. Once in my cell, in natural exasperation, I expelled the statement, "son of a bitch." She heard this and claimed I called her a bitch and then denied me a shower roll. She denied me these things without a hearing or due process. If she had a problem with my behavior she could verbally correct me or infract me. She has no authority to deprive me of the right to a shower and clean clothes without a hearing of some sort. She is abusing her position of authority. It isn't my problem that she is so obese, she holds a grudge over my previous comments about her enormous girth. It is no wonder why guards are assaulted and even killed by some prisoners. When guards like this fat Hispanic female guard abuse their position as much as they abuse their caloric intake, it can make prisoners less civilized then myself to resort to violent behavior in retaliation. She is a danger to the orderliness and security of the prison.[15]

In terms of a suggested remedy, plaintiff wrote:

> The guard in this incident should be reprimanded and educated. She should

---

[12] *Id.* at p. 5; Dkt. 52-2, p. 4.

[13] Dkt. 52-2, p. 4.

[14] Dkt. 4.

[15] Dkt. 47, p. 4.

REPORT AND RECOMMENDATION - 3

receive a staff misconduct report. She needs to learn that she cannot deprive prisoners of their right to a shower or clean clothes based on her whim.[16]

On November 15, 2011, a DOC employee issued a written response to the above grievance on behalf of defendant, who is the grievance coordinator at the SCCC, stating that plaintiff needed to "[r]ewrite – appropriately," and "[j]ust stick to the issue of what happened, when, who was involved."[17]

Two days later, plaintiff submitted a second grievance in which he asserted:

On 11-10-11, an extremely obese Hispanic female guard (who) on IMU's 2nd shift (when) verbally corrected me from turning after I stepped back from my cell. On the way along the tier, she repeatedly asked if I heard her instruction. I said, "I'm not deaf. I heard you." On the way down the steps, she told me not to pull her (I wasn't). I rolled my eyes and said, "Here we go again." (I have previously been subject to unprofessional conduct from this extremely obese Hispanic IMU 2nd shift guard before (I don't know her name). The guard then decided to take my yard and shower (what happened). Once in my cell, I remarked "son of a bitch" in exasperation. She claimed I called her a bitch and then denied me a clean shower roll. She denied me yard, my right to a shower, and a shower roll without due process or proper reason or justification. If she has a problem with my behavior, she can infract me. She's not allowed to punish me on whim by depriving me of my right to a shower.
    It is no wonder why guards are slapped and strangled by some prisoners. When guards like this obese female Hispanic guard abuse their position as much as they agues their caloric intake, it can make prisoners less civilized than myself to resort to violence in retaliation. She is a threat to the orderliness and security of the prison. THIS GRIEVANCE WHAT HAPPENED WHEN IT HAPPENED, AND WHO WAS INVOLVED. FILE AND PROCESS IT!!![18]

In regard to a suggested remedy, plaintiff stated that "[t]he guard should be reprimanded and receive a staff misconduct report," and that "[s]he needs to learn that she can't deprive prisoners of their basic rights without justification that is reasonable."[19] Again, a DOC employee other

---

[16] *Id.*

[17] *Id.*

[18] *Id.* at p. 5 (emphasis in original).

[19] *Id.*

REPORT AND RECOMMENDATION - 4

1  than defendant provided the following written response:

2      Rewrite as directed. Hispanic Female is adiquit (sic). Extremely Obese is un-
       necessary and inappraprate (sic).[20]

3

4  On December 7, 2011, plaintiff submitted an offender's kite, in which he wrote:

5      ARE YOU GOING TO PROCESS MY PROPERLY SUBMITTED
       GRIEVANCE OR WHAT? I'M NOT REWRITING IT SO DO YOUR JOB

6      AND PROCESS IT.[21]

7  The next day defendant responded by writing: "No, due to your decision not to rewrite as

8  requested, your grievance has been administratively withdrawn."[22]

9

10      Shortly thereafter, plaintiff filed a civil rights complaint in this Court under 42 U.S.C. §

11 1983, alleging defendant violated his First Amendment right to redress grievances and to be free

12 of retaliation.[23] Defendant moved to dismiss plaintiff's complaint on the basis of failure to

13 exhaust administrative remedies, failure to state a claim upon which relief may be granted, and

14 qualified immunity.[24] The Court granted defendant's motion, finding plaintiff failed to allege a

15 plausible claim for relief, in that he did not allege facts to show he engaged in protected conduct

16 or that his First Amendment rights had been chilled.[25] The Court further found plaintiff failed to

17 allege that his right to redress his grievances had been chilled by defendant's refusal to accept his

18 grievance.[26]

19

20      Plaintiff appealed the Court's decision, and the Ninth Circuit reversed noting that it had

21 "previously held that disrespectful language in a prisoner's grievance is itself protected activity

22 _____

23 [20] *Id.*; Dkt.52-2, p. 3.

   [21] Dkt. 47, p. 6.

24 [22] *Id.*

   [23] Dkt. 4, p. 5.

25 [24] Dkt. 12.

   [25] Dkt. 21, pp. 3-4.

26 [26] *Id.* at p. 4.

   REPORT AND RECOMMENDATION - 5

under the First Amendment."[27] The Ninth Circuit went on to note that while "[t]he prison has a legitimate penological interest in encouraging 'respect by inmates toward staff and other inmates, and rehabilitation of inmates through insistence of their use of socially acceptable ways of solving their problems,' . . . 'the link between this important purpose and the disrespect rules as applied to formal written grievances is weak.'"[28] In concluding that plaintiff had "stated a plausible claim that his rights were violated when the prison refused to process and investigate his grievance because it contained 'objectionable' language describing the prison guard as 'extremely obese,'" the Ninth Circuit re-emphasized its prior holdings in *Brodheim* and *Bradley* that under *Turner v. Safley*, "a prison may not take or threaten adverse action against an inmate for using disrespectful language in a grievance."[29]

In his motion for partial summary judgment, plaintiff asserts judgment should be made in his favor "on the initial claim" contained in his complaint.[30] Plaintiff did file a motion requesting leave to file a supplemental complaint containing additional claims, but that motion subsequently was denied.[31] Thus, plaintiff's First Amendment right to redress grievances and retaliation claims are the only ones currently before the Court. As such, his motion is really one for complete rather than partial summary judgment. Defendant argues summary judgment in his favor is appropriate, because plaintiff has failed to establish a valid First Amendment violation or retaliation claim, and because defendant is entitled to qualified immunity. While there are genuine issues of fact as to whether a valid First Amendment or retaliation claim exists, summary judgment in favor of

---

[27] *Richey v. Dahne*, No. 12-36045, December 8, 2015, p. 2 (Dkt. 29) (quoting *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (citing *Bradley v. Hall*, 64 F.3d 1276, 1281-82 (9th Cir. 1995))).

[28] *Id.* (quoting *Bradley*, 64 F.3d at 1280-81).

[29] *Id.* (citing 482 U.S. 78 (1987); 584 F.3d at 1272-73; 64 F.3d at 1279-81).

[30] Dkt. 46, p. 1.

[31] Dkt. 43; Dkt. 54.

REPORT AND RECOMMENDATION - 6

1  defendant is proper based on qualified immunity, and therefore the undersigned recommends the

2  Court find for defendant on this basis.

3  <u>DISCUSSION</u>

4  Summary judgment shall be rendered if the pleadings, exhibits, and affidavits show that

5  there is no genuine issue as to any material fact and that the moving party is entitled to judgment

6  as a matter of law.[32] In deciding whether summary judgment should be granted, the Court "must

7  view the evidence in the light most favorable to the nonmoving party," and draw all inferences

8  "in the light most favorable" to that party.[33] When a summary judgment motion is supported as

9  provided in Fed. R. Civ. P. 56, an adverse party may not rest upon the mere allegations or denials

10  of his pleading, but his or her response, by affidavits or as otherwise provided in Fed. R. Civ. P.

11  56, must set forth specific facts showing there is a genuine issue for trial.[34]

12

13  If the nonmoving party does not so respond, summary judgment, if appropriate, shall be

14  rendered against that party.[35] The moving party must demonstrate the absence of a genuine issue

15  of fact for trial.[36] Mere disagreement or the bald assertion that a genuine issue of material fact

16  exists does not preclude summary judgment.[37] A "material" fact is one which is "relevant to an

17  element of a claim or defense and whose existence might affect the outcome of the suit," and the

18  materiality of which is "determined by the substantive law governing the claim."[38]

19

20  Mere "[d]isputes over irrelevant or unnecessary facts," therefore, "will not preclude a

21

22  [32] Federal Rule of Civil Procedure (Fed. R. Civ. P.) 56(c).

23  [33] *T.W. Electrical Serv., Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987).
    [34] Fed. R. Civ. P. 56(e)(2).

24  [35] *Id.*

25  [36] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

26  [37] *California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987).

[38] *T.W. Electrical Serv.*, 809 F.2d at 630.

REPORT AND RECOMMENDATION - 7

grant of summary judgment."[39] Rather, the nonmoving party "must produce at least some 'significant probative evidence tending to support the complaint.'"[40] "No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment."[41] In other words, the purpose of summary judgment "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."[42]

I.      Plaintiff's First Amendment Claim

"Prisoners have a First Amendment right to file prison grievances."[43] Prison authorities thus are precluded "from penalizing a prisoner for exercising" that right.[44] As noted above, the Ninth Circuit has consistently held – including in the context of this case – that "disrespectful language in a prisoner's grievance is itself protected activity under the First Amendment."[45] Prison officials, therefore, "may not punish an inmate merely for using 'hostile, sexual, abusive or threatening' language in a written grievance."[46]

Defendant does not disagree that prison officials "may not take or threaten adverse action against an offender for disrespectful language in a grievance," but argues that they "can require that inmates follow the grievance program rules, ask for rewritten grievances when necessary for their resolution, and deem grievances abandoned or administratively withdrawn when procedural rules such as deadlines are not followed."[47] In so arguing, defendant relies on Ninth Circuit and

---

[39] *Id.*

[40] *Id.* (quoting *Anderson*, 477 U.S. at 290).

[41] *California Architectural Building Products, Inc.*, 818 F.2d at 1468.

[42] *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

[43] *Brodheim*, 584 F.3d at 1269.

[44] *Bradley*, 64 F.3d at 1279.

[45] *Richey*, No. 12-36045, at p. 2 (quoting *Brodheim*, 584 F.3d at 1271 (citing *Bradley*, 64 F.3d at 1281-82)).

[46] *Bradley*, 64 F.3d at 1282.

[47] Dkt. 52, p. 11.

REPORT AND RECOMMENDATION - 8

other court cases holding that inmates have no right to choose specific grievance procedures or how their concerns are presented to prison officials.

Plaintiff, however, is not arguing that he has a right to choose the specific grievance *procedure* he has to follow, that he should not have to file a written grievance, or that he should be able to present his concerns outside the regular grievance process. Nor is he claiming that "he should be allowed to write whatever he wishes in a grievance."[48] Rather, plaintiff is alleging that by requiring him to rewrite his grievance defendant has impermissibly infringed on his First Amendment right to seek redress. This is substantively different from those cases that defendant relies on, wherein the plaintiffs were challenging the procedures themselves.[49] Indeed, none of those cases concerned a First Amendment claim.[50] Defendant cites *Pell v. Procunier* as well, but cites it for the uncontroversial proposition that not all First Amendment rights are consistent with the status of prisoner.[51] Further, that case involved the right of access to the press and not that of prisoners to redress grievances.[52]

The undersigned also rejects defendant's argument that requiring plaintiff to rewrite his grievance is merely an administrative act on the part of the prison, and cannot itself constitute an "adverse action" or punishment. In *Bradley*, the Ninth Circuit rejected the prison's argument that "the disrespect rules" at issue there "do not hinder a prisoner from *filing* a grievance or suit, but merely from using inappropriate language within the grievance itself."[53] The Ninth Circuit went

---

[48] *Id.*

[49] *Id.* (citing *Ramirez v. Galaza*, 334 F.3d 850 (9th Cir. 2003); *Mann v. Adams*, 855 F.3d 639 (9th Cir. 1988); *Pavey v. Conley*, 663 F.3d 899 (7th Cir. 2011)).

[50] *Id.*

[51] Dkt. 52, p. 12.

[52] *Pell*, 417 U.S. 817 (1974).

[53] 64 F.3d at 1279 (emphasis in original); *see also Richey*, No. 12-36045, at p. 3.

REPORT AND RECOMMENDATION - 9

on to explain:

> We are not persuaded by the [prison's] argument that punishing a prisoner for the content of his grievance does not burden his ability to file a grievance. From the prisoner's point of view, the chilling effect is the same. Whether the content of the grievance or the act of filing the grievance is deemed to be the actus reus of the offense, the prisoner risks punishment for exercising the right to complain.[54]

While a violation of the disrespect rules at issue in *Bradley* could result in a citation as opposed to a directive to rewrite the grievance, unless plaintiff agrees to rewrite his grievance to exclude the protected language at issue in this case, that grievance will not be accepted. In other words, he will be prevented from *filing* his grievance for engaging in constitutionally protected activity. This certainly *could* amount to the type of adverse action or punishment by prison officials the Ninth Circuit has found to be precluded under the First Amendment. As such, a genuine issue of fact exists here making summary judgment on this basis inappropriate.

Defendant attempts to distinguish *Bradley* on the basis that it concerned "an absolute prohibition on disrespectful language in all prison communications."[55] The Ninth Circuit did reject the prison's argument "that to permit the utterance of disrespectful language in *any* form at *any* time would result in a total breakdown of prison security and discipline."[56] But the same reasoning the Ninth Circuit used in *Bradley* to find a restriction on the content of a grievance can constitute an impermissible chilling of an inmate's First Amendment rights, applies here. First, similar to the regulation at issue in that case, the OGP prohibits use of profane language unless it is a direct quote. Second, in *Brodheim*, the Ninth Circuit found that reasoning applied equally to a prison official's warning to an inmate to be careful about what he writes in his grievance, even

---

[54] *Bradley*, 64 F.3d at 1279.

[55] Dkt. 52, p. 12.

[56] *Bradley*, 64 F.3d at 1281 (emphasis in original).

REPORT AND RECOMMENDATION - 10

though no actual prison regulation appeared to be implicated.[57] Even more on point, the Ninth

Circuit in *Richey* – again in the context of this case – expressly rejected defendant's attempt to

distinguish *Bradley* on this basis.[58]

Equally without merit is defendant's assertion that the Ninth Circuit's concern in *Bradley*

with the weakness of "the link" between the important governmental interest "in the peaceable

operation of the prison" and "the respect rules as applied to formal written grievances,"[59] is not

at issue here. "Prison regulations that infringe a prisoner's constitutional right are valid so long

as they are 'reasonably related to legitimate penological interests.'"[60] In *Bradley*, the Ninth

Circuit found no such reasonable relation existed, explaining that "[i]f a line between honest,

unabashed airing of a grievance and 'hostile, . . . [or] abusive' language exists, it is a hazy one,

leaving the aggrieved prisoner guessing whether he will be punished for what he has said in his

formal prison complaint."[61]

Defendant once more attempts to distinguish *Bradley* on the basis that while the Ninth

Circuit's "concern was predicated on the notion that offenders could be punished for falling on

the wrong side of that line," under the OGP "offenders are encouraged to speak openly with the

grievance coordinator or the responding staff member about rewrite instructions and . . . there is

no punishment or disadvantage associated with" such instructions.[62] As explained above though,

prohibiting an inmate from going forward with filing his grievance unless he rewrites it so as to

exclude language found to be inappropriate or disrespectful, certainly *could* be deemed to be an

---

[57] *Brodheim*, 584 F.3d at 1272-73.

[58] No. 12-36045, at p. 3.

[59] *Bradley*, 64 F.3d at 1281.

[60] *Bradley*, 64 F.3d at 1279 (quoting *Turner*, 482 U.S. at 89).

[61] *Id.* at 1281.

[62] Dkt. 51, p. 12.

REPORT AND RECOMMENDATION - 11

adverse action and/or punishment. Thus, defendant has failed to show the absence of a genuine issue of material fact in regard to plaintiff's First Amendment claim here as well.

Lastly, defendant argues that under *Turner*, the OGP's written grievance guidelines are a permissible limitation on plaintiff's First Amendment rights. The Supreme Court identified four factors in *Turner* district courts are to "consider when determining the reasonableness of a prison rule."[63] Those factor are:

> 1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; 2) "whether there are alternative means of exercising the right that remain open to prison inmates"; 3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally"; and 4) the "absence of ready alternatives" or, in other words, whether the rule at issue is an "exaggerated response to prison concerns."[64]

Defendant relies on the Supreme Court's decision in *Woodford v. Ngo*, to argue that "[p]risons have a legitimate penological interest in requiring that inmate grievances contain straightforward statements of offenders' concerns and do not abuse or implicitly threaten staff."[65] But this is not what that case stands for. Rather, in upholding the requirement of exhaustion of administrative remedies, the Supreme Court merely pointed out that such a requirement "promotes efficiency," since "[c]laims generally can be resolved much more quickly and economically in proceedings before the agency than in litigation in federal court."[66]

As discussed above, furthermore, although a prison does have a "legitimate penological interest in encouraging 'respect by inmates toward staff . . . and rehabilitation of inmates through insistence on their use of socially acceptable ways of solving problems," as the Ninth Circuit has

---

[63] *Bradley*, 64 F.3d at 1279 (citing 482 U.S. at 89-90).

[64] *Id.* at 1279-80 (quoting 482 U.S. at 89-90).

[65] Dkt. 52, p. 13 (citing 548 U.S. 81, 89 (2006)).

[66] *Woodford*, 548 U.S. at 89.

REPORT AND RECOMMENDATION - 12

consistently noted, "'the link between this important purpose and the disrespect rules as applied

to formal written grievances is weak.'"[67] Defendant goes on to argue that the OGP's guidelines

on written grievances satisfy the other *Turner* factors. But as the Supreme Court has emphasized:

> First and foremost, "there must be a 'valid, rational connection' between the prison regulation and the legitimate [and neutral] governmental interest put forward to justify it." If the connection between the regulation and the asserted goal is "arbitrary or irrational," then the regulation fails, irrespective of whether the other factors tilt in its favor.[68]

Even considering those other factors, they likely also would remain unsatisfied. As the *Bradley*

court explained:

> The [prison]'s legitimate security concerns would be largely served by procedures that require grievances to be in writing and shield those prison officials who are in direct contact with the inmates from reading any insulting remarks that might be contained in those grievances. In so saying, we do not mandate any alteration to [prison]'s current procedures, but merely state that there are obvious, simple alternatives that both accommodate the prisoner's right to file a grievance and prevent any open expression of disrespect or any disrespectful communication between prisoner and guard or between prisoner and prisoner. It takes little imagination to structure a grievance system and regime of disrespect rules that would make a prisoner's statements in a complaint or grievance invisible to all those involved in the daily operations of the prison, alleviating any security concern. A prisoner's statement in a grievance need not have any more impact on prison security through the maintenance of respect than the prisoner's unexpressed thoughts.[69]

Defendant has put forth no plausible reason why the same procedures could not be implemented

in the context of this case. Defendant does assert that such procedures are "actually not practical

or workable in a the prison context where staff members being grieved have the duty, and the

right, to know the grievances levied against them and provide a response as part of the resolution

---

[67] *Richey*, No. 12-36045, at p. 2 (quoting *Bradley*, 64 F.3d at 1280-81).

[68] *Shaw v. Murphy*, 532 U.S. 223, 229-30 (2001) (quoting *Turner*, 482 U.S. at 89-90) (internal citations omitted).

[69] 64 F.3d at 1281 (internal citation omitted).

REPORT AND RECOMMENDATION - 13

process."[70] But defendant points to no legal authority or specific prison regulation to support the proposition, that staff members have the duty or right to be exposed to the type of inappropriate language defendant also argues has no place in the grievance process. In other words, defendant has not shown that screening staff members from such language or other similar methods would in any way hinder the prison's ability to amicably address the grievance itself.

It is true that Supreme Court overturned the Ninth Circuit's balancing of "the importance of the prisoner's infringed right against the importance of the penological interest served by the rule" in *Bradley*, holding that "the *Turner* test, by its terms, simply does not accommodate valuations of content."[71] But in *Brodheim*, the Ninth Circuit expressly held that it had "reach[ed] the same result" when "solely applying the *Turner* factors," and in *Richey* it reiterated its prior holdings in *Brodheim* and *Bradley* that under *Turner*, "a prison may not take or threaten adverse action against an inmate for using disrespectful language in a grievance."[72] Accordingly, for all of the above reasons, defendant has failed to establish the absence of genuine issues of material fact as to plaintiff's First Amendment claim.

II.      Plaintiff's Retaliation Claim

"Retaliation against prisoners for their exercise of" their right to file prison grievances "is itself a constitutional violation."[73] There are five elements of a retaliation claim:

> (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.[74]

---

[70] Dkt. 52, p. 18.

[71] *Shaw*, 532 U.S. at 230 and n. 2; *Brodheim*, 584 F.3d at 1272; *Bradley*, 64 F.3d at 1280.

[72] 584 F.3d at 1272-73; No. 12-36045, at p. 2.

[73] *Brodheim*, 584 F.3d at 1269.

[74] *Id.* (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

REPORT AND RECOMMENDATION - 14

Under the first three elements, plaintiff must show his protected conduct was the "'substantial' or 'motivating' factor behind the defendant's conduct."[75] To do this, plaintiff "need only 'put forth evidence of retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of material fact as to [the defendant's] intent.'"[76]

This case is distinguishable from *Bradley* and *Brodheim*, defendant argues, because it does not involve any actual punishment or warning of punishment, but merely "an instruction to rewrite the grievance in accordance with policy."[77] There is no dispute, however, that defendant instructed plaintiff to rewrite his grievance *because* of the inappropriate language it contained. Nor is there any dispute that plaintiff's grievance would not be processed unless he re-wrote it without that language. Defendant asserts plaintiff is not being punished thereby, but certainly he is being subject to a form of "adverse action" in that he would not be allowed to proceed with his written grievance if failed to comply.[78] At the very least, there is a genuine issue of material fact as to whether disallowing plaintiff to proceed constitutes the type of adverse action necessary to establish a retaliation claim.

Defendant also argues plaintiff's own statements indicate he is not "one who has become hesitant to speak."[79] But "an allegation that a person of ordinary firmness would have been chilled is sufficient to state a retaliation claim."[80] Thus, "focus[ing] on whether or not the record showed [plaintiff] was actually chilled [is] incorrect."[81] "[A] plaintiff does not have to show that

---

[75] *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989); *see also Brodheim*, 584 F.3d at 1271.

[76] *Id.* (quoting *Bruce v. Ylst*, 351 F.3d 1283 1289 (9th Cir. 2003)).

[77] Dkt. 52, p. 19.

[78] *Brodheim*, 584 F.3d at 1271.

[79] Dkkt. 52, p. 20.

[80] *Brodheim*, 584 F.3d at 1270.

[81] *Id.* at 1271.

REPORT AND RECOMMENDATION - 15

'his speech was actually inhibited or suppressed,'" therefore, "but rather that the adverse action at issue 'would chill *or* silence a person of ordinary firmness from future First Amendment activities.'"[82] "To hold otherwise 'would be unjust' as it would 'allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity."[83] As "[a] reasonable person *may* have been chilled by" the re-write instruction, it cannot be said "as a matter of law" that plaintiff "has failed to meet this objective standard."[84]

Lastly, defendant argues the requirement that plaintiff re-write his grievances to exclude unnecessary and inappropriate language, reasonably advances the legitimate correctional goals of resolving disputes, maintaining order and respect, and enforcing prison rules. But as discussed above, while these may constitute legitimate correctional goals, as the Ninth Circuit consistently has pointed out, it is highly questionable as to whether the requirement that plaintiff re-write his grievance *reasonably* advances them. Accordingly, defendant has failed to show the absence of genuine issues of material fact in regard to plaintiff's retaliation claim.

III.   Defendant's Qualified Immunity Defense

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[85] Qualified immunity thus shields government officials from money damages, unless the plaintiff "pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established'

---

[82] *Id.* (quoting *Rhodes*, 408 F.3d at 568-69) (emphasis in original).

[83] *Id.* (quoting *Rhodes*, 408 F.3d at 569).

[84] *Id.*

[85] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

REPORT AND RECOMMENDATION - 16

1   at the time of the challenged conduct."[86]

2        In considering the first prong, the Court must determine whether "[t]aken in the light

3   most favorable to the party asserting the injury, do the facts alleged show the officer's conduct

4   violated a constitutional right?"[87] With respect to the second prong, an official's conduct

5   "violates clearly established law when, at the time of the challenged conduct, '[t]he contours of

6   [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what

7   he is doing violates that right.'"[88] "This inquiry," furthermore, "must be undertaken in light of

8   the specific context of the case, not as a broad general proposition."[89] The burden is on the

9   plaintiff to show that the right was clearly established.[90]

10

11       "If the law did not put the [official] on notice that his conduct would be clearly unlawful,

12  summary judgment based on qualified immunity is appropriate."[91] As such, qualified immunity

13  "protects 'all but the plainly incompetent or those who knowingly violate the law.'"[92] On the

14  other hand, "the very action in question" need not "have previously been held unlawful."[93] That

15  is, "[t]he precise facts need not have been previously determined, so long as the legal principle is

16  clearly established and a reasonable public official would realize that his conduct violated that

17  rule of law."[94] Nevertheless, "[t]he right the official is alleged to have violated must be made

18

19

20

21  [86] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow*, 457 U.S. at 818).

22  [87] *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

    [88] *al-Kidd*, 563 U.S. at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

23  [89] *Saucier*, 533 U.S. at 201.

24  [90] *Sorrels v. McKee*, 290 F.3d 965, 969 (9th 2002).

    [91] *Saucier*, 533 U.S. at 202; *see also Harlow*, 457 U.S. at 818.

25  [92] *Saucier*, 533 U.S. at 202 (quoting *Malloy v. Briggs*, 475 U.S. 335, 341 (1986)).

26  [93] *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Creighton*, 483 U.S. at 640).

    [94] *Delker v. Maass*, 843 F.Supp. 1390, 1397 (D. Ore. 1994).

REPORT AND RECOMMENDATION - 17

specific in regard to the kind of action complained of for the constitutional right at issue to have been clearly established."[95]

The defense of qualified immunity, furthermore, "has both an 'objective' and a 'subjective' aspect."[96] "The objective element involves a presumptive knowledge of and respect for 'basic, unquestioned constitutional rights.'"[97] Thus, "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness' of the action . . . assessed in light of the legal rules that were 'clearly established' at the time it was taken."[98] Under the subjective element, qualified immunity will be defeated "if an official '*knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], *or* if he took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury.'"[99]

A court "may grant qualified immunity on the ground that a purported right was not 'clearly established' by prior case law, without resolving the often more difficult question whether the purported right exists at all."[100] While "a case directly on point" is not required to grant qualified immunity, for a right to be clearly established "existing precedent must have placed the statutory or constitutional question beyond debate."[101] "This is not to say," as noted above, "that an official action is protected by qualified immunity unless the very action in

---

[95] *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 70 F.3d 1095, 1100-01 (9th Cir. 1995) (citing *Anderson*, 483 U.S. at 639-40).

[96] *Harlow*, 457 U.S. at 815.

[97] *Harlow*, 457 U.S. at 815 (quoting *Wood v. Strickland* 420 U.S. 308, 322 (1975)).

[98] *Creighton*, 483 U.S. at 639 (quoting *Harlow*, 457 U.S. at 818-19).

[99] *Harlow*, 457 U.S. at 815 (emphasis in original).

[100] *Reichle v. Howards*, 132 S.Ct. 2088, 2093 (2012).

[101] *al-Kidd*, 563 U.S. at 741.

REPORT AND RECOMMENDATION - 18

1  question has previously been held unlawful."[102] "[I]n the light of pre-existing law," though, "the

2  unlawfulness must be apparent."[103]

3       Defendant argues he is entitled to qualified immunity in this case. The undersigned

4  agrees. As discussed above, there are genuine issues of material fact as to whether defendant's

5  conduct violated plaintiff's constitutional rights. Accordingly, the question is whether those

6  rights were clearly established at the time of the challenged conduct. While at the time of the

7  challenged conduct in this case the Ninth Circuit had established that inclusion of disrespectful

8  language in a grievance "is itself protected activity," it cannot be said that instructing an inmate

9

10 to rewrite a grievance because of the inclusion thereof, necessarily amounted to a violation of an

11 inmate's First Amendment right to redress grievances. Indeed, as discussed above, genuine

12 issues of material fact exist as to whether instructing plaintiff to do so constitutes an adverse

13 action and/or punishment, or whether it is reasonably related to a legitimate penological interest.

14 That is at the time of the challenged conduct, it cannot be said that existing precedent placed this

15

16 constitutional question "beyond debate."

17                         CONCLUSION

18       Based on the foregoing discussion, the undersigned recommends that plaintiff's motion

19 for partial summary judgment be denied, that defendant's cross motion for summary judgment be

20 granted, and therefore that plaintiff's complaint be dismissed.

21       The parties shall have **fourteen (14) days** from service of this Report and

22

23 Recommendation to file written objections thereto.[104] Failure to file objections will result in a

24

25 ───────────────
[102] *Creighton*, 483 U.S. at 640.

26 [103] *Id.*

[104] 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6; Fed. R. Civ. P. 72(b).

REPORT AND RECOMMENDATION - 19

waiver of those objections for purposes of appeal.[105] Accommodating this time limitation, this matter shall be set for consideration on **July 15, 2016**, as noted in the caption.

DATED this 27th day of June, 2016.

Karen L. Strombom
United States Magistrate Judge

---

[105] *Thomas v. Arn*, 474 U.S. 140 (1985).

REPORT AND RECOMMENDATION - 20